834 A.2d 459 (2003)
364 N.J. Super. 68
Sandra G. CAPLAN, Plaintiff-Appellant/Cross-Respondent,
v.
Craig CAPLAN, Defendant-Respondent/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 8, 2003.
Decided November 12, 2003.
*462 Dale E. Console, Skillman, argued the cause for appellant/cross-respondent.
James P. Yudes, Springfield, argued the cause for respondent/cross-appellant (Kevin M. Mazza, on the brief).
Before Judges HAVEY, NEWMAN and FALL. *460
*461 The opinion of the court was delivered by FALL, J.A.D.
In this matrimonial matter, we examine the procedures applicable to establishing a child support obligation where the parents' combined net unearned income exceeds the maximum threshold established by the child support guidelines, Rule 5:6A, Appendix IX-F, under circumstances where both parents have significant income-producing assets, neither parent has any earned income, and one parent, who had been a high-income earner, is voluntarily unemployed.
Here, after a non-jury trial on limited issues, plaintiff Sandra G. Caplan appeals from the court's rulings on issues of child support, counsel fees, and management of certain trust funds, as memorialized in the supplemental final judgment entered on February 20, 2002, and from an order *463 issued on May 15, 2002, denying her motion for reconsideration. Defendant cross-appeals, contending the trial judge improperly required him to contribute toward expenses unrelated to the children's needs, and that the effective date of the child support determination was erroneous. The following factual and procedural history is relevant to our consideration of the issues advanced on appeal.
The parties were married on April 17, 1988. Two children were born of the marriage: Daniel, on July 26, 1989; and Jacob, on December 12, 1991. Plaintiff was born on April 29, 1963; defendant was born on November 4, 1963. The complaint for divorce was filed on January 12, 1998; an answer and counterclaim for divorce was filed on March 23, 1998.
The parties entered into mediation and, on January 30, 2001, executed a settlement agreement resolving issues of custody, parenting time, equitable distribution, and alimony. Pursuant to that agreement, plaintiff agreed to waive alimony and to the distribution of various assets to defendant in return for a lump-sum payment made to her by defendant in the amount of $2,075,000. Additionally, defendant agreed to deed the marital domicile, 41 Deer Creek Drive, Basking Ridge, then valued at approximately $910,000 with no mortgage encumbering the property, to plaintiff. Plaintiff represented that the terms of the settlement would permit her to live at a standard of living reasonably comparable to that achieved during the marriage.
On February 8, 2001, the court entered a "Final Judgment Fixing Custody and Parental Contact," which established custody and parenting time in accordance with the terms of the parties' agreement. Under that agreement, the parties were to share joint legal custody of the children. Primary residential custody was vested with plaintiff, with secondary residential custody awarded to defendant. The judgment set forth a detailed parenting-time schedule. The parties also acknowledged their agreement that a Special Needs Trust would be established for their son Daniel, and that there would be future issues relating to Daniel, such as his education, vocational training, residence, and health care. The parties agreed to select a mediator to assist them in addressing those issues. The amount of defendant's obligation for child support and associated expenses of the children, and the issue of counsel fees on the application for child support, were unresolved.
By letter to defendant dated June 5, 2001, entitled "Separation Agreement and Release," the terms of defendant's separation from his employment with Citibank, N.A. and Salomon Smith Barney, Inc. were outlined by his employer. The "agreement" acknowledged that the parties had been negotiating the terms of the agreement since April 16, 2001. The agreement set forth that defendant's employment was being terminated, effective June 30, 2001, due to a reduction in force. At that point, defendant was age thirtyseven. In consideration for entering into the agreement, defendant's employer agreed to compensate defendant with gross severance pay in the amount of $115,384.62; continue health care coverage at no cost for three months and pay 50% of the costs thereof for another three months; and provide defendant with job placement services commencing on the effective date of the agreement. Prior to the termination of his employment, defendant had gross earned income of $1,796,326 in 1996; $2,434,773 in 1997; $1,093,531 in 1998; $2,945,454 in 1999; and $4,615,273 in 2000.
The unresolved issues of child support and counsel fees were tried non-jury in the Family Part on April 30, May 2, June 5, *464 and June 13, 2001. On December 28, 2001, a judgment of divorce was entered dissolving the marriage. On January 16, 2002, the judge placed his decision concerning the tried issues on the record. On February 20, 2002, the court entered a supplemental judgment memorializing that decision; in summary, it provided, as follows:
1. Effective January 16, 2002, defendant was required to pay child support to plaintiff in the amount of $5,391.34 per month, allocated $2,695.67 per child;
2. Plaintiff shall pay 34.82 percent, and defendant 65.18 percent, of the following expenses on behalf of the children:
a. Medical insurance, which will be maintained by defendant, and unreimbursed medical expenses, including hospital, prescriptions, psychiatric, and counseling costs;
b. Summer camp;
c. Dental expenses, including orthodontia;
d. Bar Mitzvah expenses;
e. $10,000 contribution to each child's UGMA account;
f. Jacob's college, graduate school and miscellaneous educational costs not covered by his UGMA account;
g. Daniel's post secondary education, training costs, health insurance and residential expenses;
3. Daniel's current UGMA shall be placed in a Special Needs Trust and defendant shall provide plaintiff with trust statements twice each year, with the costs of the trust to be borne by the parties in accordance with their respective percentages;
4. Defendant shall manage Jacob's UGMA account and his Special Needs Trust, and provide plaintiff statements twice each year;
5. Defendant shall be responsible for complying with applicable tax laws on behalf of Daniel and Jacob;
6. Plaintiff shall claim both children as dependents for tax purposes;
7. Each party shall maintain a life insurance policy on his or her life in the amount of $1,000,000, with the children as equal beneficiaries, with the other party named as trustee. Upon emancipation of one child, the policy coverage may be reduced by $500,000;
8. Plaintiff's application to require defendant to purchase an automobile and provide automobile insurance for each child upon reaching the child's seventeenth birthday is denied without prejudice;
9. Plaintiff's application to require defendant to devise and bequeath all assets set forth on his case information statement to the children, is denied;
10. Each party shall pay their own respective counsel fees.
In considering the evidence and rendering his decision on these issues, the trial judge stated, in pertinent part:
Mr. Caplan was employed by Salomon Smith Barney from July 1987 until June 2001 as a mortgage trader. Mr. Caplan was terminated and a separation agreement signed.
In the agreement, Mr. Caplan was provided with two months compensation after he actually left the trading desk, pre-tax severance pay in the amount of $115,000, and he retained deferred compensation, all of which had been included in the total of his income-producing assets. Mr. Caplan's current unemployment does not adversely affect his ability *465 to support his two sons, Daniel and Jacob.
Mrs. Caplan has not worked outside the home since the minor child Daniel was born, except for a brief period in 1999 when she earned $2,591.
The parties' son Daniel is a special needs child. He is enrolled in a special education program in public school. He has been diagnosed with ADHD.
Mrs. Caplan is a stay-at-home mother who spends her time helping her sons, especially Daniel, with important everyday activities.
* * * *
Mrs. Caplan sold the former marital home for its worth [$910,000] and purchased her new home on Landow Road for $549,000. Her new home is smaller than the parties' marital home.
Mr. Caplan has remained unemployed voluntarily since his termination. He is also living in his home in Maryland.
* * * *
With regard to the Caplans' lifestyle during their marriage, Mrs. Caplan characterized their life together as an "upper-class standard of living" where they lived in a mortgage-free home of 4,000 square feet and drove BMW and Mercedes automobiles.
The Caplans had live-in help, vacationed in Africa, Europe and Mexico and frequented Broadway shows and expensive restaurants according to Mrs. Caplan.
Mr. Caplan characterizes the lifestyle of the parties as "initially modest," which in time became upper middle class. On account of his increased earned income, he described this lifestyle as comfortable and pleasant.
While their marriage is at an end, both Sandra Caplan and Craig Caplan acknowledge that their family has been blessed economically, and each recognizes their shared and fundamental responsibilities for the support of their two beloved sons, Daniel and Jacob.
* * * *
The starting point in the court's analysis, in every case concerning an award of child support, is to be found in the child support guidelines enunciated in Rule 5:6A[.] ...
* * * *
If the combined net income of the parents is more than $150,800 per year, the court shall apply the guidelines up to $150,800 and supplement the guidelines based award with a discretionary amount based on the remaining family income; for example, income in excess of $150,800, and the factors specified in N.J.S.A. 2A:34-23[a].
* * * *
Appendix IX-A also counsels that in situations where extreme parental income is involved, that although these guidelines apply to all actions to establish and modify child support awards, extremely low or high parental income situations make the Appendix IX-F awards inappropriate due to the limitations of the economic data.
Statutory analysis: Counsel for the parties agree, and the court so finds, in keeping with [Walton v. Visgil, 248 N.J.Super. 642, 649, 591 A.2d 1018, 1021-22 (App.Div.1991)], that as the combined net Caplan family income exceeds $150,800 per year, the court must initially apply the guidelines maximum total child support for two children, and supplement this award with an additional support amount based upon the actual family income and the dispositive legislative factors set forth in N.J.S.A. 2A:34-23[a].
* * * *
*466 This court finds and concludes that for purposes of calculating support for Daniel and Jacob Caplan, Mr. Caplan's income-producing assets total $4,539,476, and those of Mrs. Caplan are $2,415,964. This yields a shared responsibility child support obligation ratio of 65.18 percent for Mr. Caplan and 34.82 percent for Mrs. Caplan.
The court further finds that as the combined net income of the Caplan family clearly exceeds $150,800 per year, the dispositive legislative factors set forth in N.J.S.A. 2A:34-23[a] require this court to supplement the [ruled-based] maximum total child support for two children with an additional support payment based upon these factors and the actual family income.
A review of the pertinent expenses contained in Schedules A, B and C of the submitted case information statements is initially required. This court reaches today's conclusions based upon a specific review of the particular expenses contained in these statements that are clearly applicable to Daniel and Jacob.
Generally, Mr. Caplan shall be obligated to pay a specified portion of Schedule A and Schedule C expenses presented in Mrs. Caplan's submissions.
While Mrs. Caplan contends that two-thirds of her case information Schedule A expenses are attributable to Daniel and Jacob, the court declines to embrace this proposition and underscores that expenses for taxes, insurance, repairs, garbage, snow removal, lawn care, exterminator and plumbing remain solely Mrs. Caplan's and are not fairly attributable to the children.
Accordingly, Mr. Caplan shall be obligated for the sum of $486.54 per month which represents 65.18 percent of the total Schedule A expenses of $746 which are properly related to the children and include heat, electric and gas, water and sewer, phone and television. These expenses total $746 per month. Thus, 65.18 percent, or $486.54, remain Mr. Caplan's obligation.
In addition, the court finds and concludes that the Schedule C expenses of Mrs. Caplan's submission provide a fair and accurate estimation of Daniel and Jacob's monthly requirements.
These Schedule C child expenses total $7,525. Mr. Caplan's portion of this total is $4,904.80, which represents 65.18 percent of the total Schedule C expenses for his two sons.
Furthermore, while Mrs. Caplan suggests that one hundred percent of the Schedule B expenses are attributable to their children, this court finds and concludes they remain the sole responsibility of Mrs. Caplan.
Thus, this court finds, concludes and orders that Mr. Caplan's total child support obligation [is] $5,391.34 per month, or $1,253.80 per week. This sum is arrived at by adding the sums of $486.54 and $4,904.80, [totaling] $5,391.34, and dividing this total by 4.3.
This support obligation yields an amount which comports with the directives of the child support guidelines calculations for extreme parental income situations.
This court further concludes, finds and orders that ... Mr. Caplan shall be responsible for 65.18 percent of [the following] obligations, and Mrs. Caplan shall be responsible for 34.82 percent of them:
A. Medical insurance and unreimbursed medical expenses for Daniel and Jacob;
B. The boys' summer camp;
C. Dental expenses, including orthodontia for Daniel and Jacob;

*467 D. The bar mitzvah expenses for each child;
E. The $10,000 contribution to each of the boys' UGMA accounts;
F. Jacob Caplan's college and miscellaneous educational cost not covered by his UGMA account;
G. Daniel's post-secondary education and training costs.
On or about March 8, 2002, defendant filed a motion seeking reconsideration of the amount of child support set forth in the supplemental judgment. In his moving certification, defendant contended that the monthly needs of the children were $3,815.29, not $5,391.34 as found by the court.
Specifically, defendant claimed there was a mathematical error in the calculation of the Schedule C, personal expenses of the children as listed on plaintiff's case information statement, stating that those listed expenses actually totaled $7,450 per month, not $7,525 as found by the court. Defendant also argued that some of the children's expenses that he had been separately ordered to pay 65.18 percent thereof were actually already included within plaintiff's listing of the children's expenses contained in her case information statement. Those expenses of the children that he contended had been "double counted" by the court included medical, dental, and summer camp, totaling $755 per month.
Defendant also noted that plaintiff's case information statement listed $1,382 as a monthly expense for "gifts," of which she allocated $832 as an expense made or incurred on behalf of the children, yet listed no expense for herself or the children under the category "contributions." However, defendant stated that during her direct examination at the hearing, plaintiff had testified that she had combined "gifts" and "contributions" together in reaching the figure of $1,382 listed under "gifts" in her case information statement. Defendant argued that charitable contributions "are not an appropriate child support expense."
Additionally, based upon plaintiff's testimony, defendant noted that plaintiff's actual charitable contributions during the pendente lite period had averaged approximately $1,473.52 per month, greater than the amount listed by plaintiff in her case information statement for the combined expenses of gifts and charitable contributions. Defendant suggested that an appropriate expense for gifts for the children would be $100 per month, and that the listed $832 monthly expenses should thereby be reduced by $732.
Plaintiff filed a cross-motion, seeking an order denying defendant's motion; increasing defendant's child support obligation to $9,931.77 per month, taking into consideration plaintiff's projected Schedule C personal expenses for the children or, alternatively, increasing the child support obligation by $1,416.01, taking into consideration plaintiff's additional Schedule A shelter costs, and those Schedule B transportation costs attributable to the children. Plaintiff also argued that yearly gross income of $3,800,000 should be imputed to defendant and, since defendant's total imputed earned income and his unearned income would thereby constitute ninety-eight percent of their combined income, defendant should be required to pay ninety-eight percent of the children's needs.
In her cross-motion, plaintiff also sought an order requiring defendant to pay accumulated support arrears of $5,518.04; compelling defendant to produce documentation concerning the cost of medical insurance; directing defendant to reimburse her $811.18, representing his share of the children's unreimbursed medical expenses incurred; ordering defendant to pay his share of the children's summer camp expenses *468 in the amount of $1,759.86; requiring defendant to provide plaintiff with copies of the children's investment account statements from April 1, 2001 to the present; and for assessment of plaintiff's counsel fees and costs against defendant.
In her supporting certification, plaintiff stated that her projected Schedule C expenses were $14,491, of which defendant should pay 65.18 percent thereof, or, $9,445.23, plus a share of the Schedule A expenses, for a total monthly support of $9,931.77. Plaintiff further contended that an appropriate allocation of her Schedule A shelter expenses and her Schedule B transportation expenses to the children would result in an increase in defendant's monthly child support obligation by $1,416.01 from its current level. Plaintiff also certified that defendant was voluntarily unemployed, yet had the capacity to earn $3,800,000 per year, which amount should be imputed to him and his calculated child support obligation should be based on that level of income.
The motions were submitted to the court for a ruling on the filed papers. On May 15, 2002, the judge issued an order setting forth his written findings and conclusions on the various issues. In denying defendant's application for reduction of the amount of his direct monthly child support from $5,391.34 to $3,815.29, the judge stated, in pertinent part:
Defendant puts forth to the Court that the child support amount of $5,391.34 should be reduced as the Court ordered him to pay additional expenses of summer camp, medical insurance, unreimbursed medical expenses, dental expenses which were already accounted for in the child support amount. However, the Court notes to the Defendant that the Defendant's additional obligations such as the ones listed above, the bar mitzvah expenses for each child, the $10,000 contribution to the children's UGMA accounts, college, etc. were not incorporated into the $5,391.34 child support. These expenses were to be paid for separately, therefore, in light of Defendant's argument, the summer camp, dental and medical expenses will not have to be paid on a separate basis as they are already included into the child support and Defendant has and will satisfy those obligations through his payment of child support.
Furthermore, the Court notes that it utilized the Plaintiff's Schedule C total expenses of $7,525 from page 12 of the chart which was included in Plaintiff's Findings of Fact and Conclusions of Law. Therefore, the Court finds that as the Defendant has not provided the Court with any new information for it to consider that would justify these adjustments, the Defendant's requests are denied.
The judge also denied plaintiff's applications to increase defendant's child support obligation to $9,931.77 or, in the alternative, to require defendant to pay ninety-eight percent of the children's needs by imputing an annual income to him of $3,800,000, on the basis that plaintiff "has put forth no new information for the Court to consider[.]"
On appeal, plaintiff presents the following arguments for our consideration:
POINT ONE
THE TRIAL COURT ERRED IN REQUIRING PLAINTIFF TO PAY ALL OF THE TRANSPORTATION AND VIRTUALLY ALL OF THE SHELTER EXPENSES WITHOUT CONTRIBUTION FROM DEFENDANT.
POINT TWO
THE TRIAL COURT ERRED IN ALLOCATING THE PERCENTAGE SHARE OF THE CHILDREN'S EXPENSES *469 BASED SOLELY ON THE DISTRIBUTION OF ASSETS WITHOUT CONSIDERATION OF DEFENDANT'S EARNING CAPACITY [WHICH] AVERAGED $2.5 MILLION PER YEAR OVER THE PAST FIVE YEARS.
POINT THREE
THE TRIAL COURT ERRED IN RESTRICTING THE CHILDREN'S NEEDS TO PLAINTIFF'S PENDENTE LITE EXPENDITURES AND FAILED TO CONSIDER PROJECTED EXPENSES THAT WERE CONSISTENT WITH DEFENDANT'S CURRENT LIFESTYLE.
POINT FOUR
DEFENDANT'S ASSETS SHOULD NOT HAVE BEEN REDUCED BY THE VALUE OF HIS 401(k) PLAN OR THE TAXES HE MAY PAY ON THE PLAN IN TWENTY YEARS.
POINT FIVE
PLAINTIFF SHOULD HAVE BEEN NAMED AS CUSTODIAN OF DANIEL'S SPECIAL NEEDS TRUST SINCE SHE HAS PRIMARY RESPONSIBILITY FOR HIS DAILY NEEDS.
POINT SIX
THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S REQUEST FOR COUNSEL FEES WHERE SHE ACTED IN GOOD FAITH, THE ISSUES RELATED SOLELY TO THE SUPPORT OF THE CHILDREN AND DEFENDANT HAS VASTLY SUPERIOR ASSETS AND EARNING POTENTIAL.
On his cross-appeal, defendant advances the following arguments, as denominated in his brief:
POINT VI
THE TRIAL COURT ERRED BY INCLUDING WITH ITS CALCULATION OF THE CHILDREN'S NEEDS, EXPENSES WHOLLY UNRELATED TO THE CHILDREN OR THEIR STANDARD OF LIVING.
POINT VII
THE TRIAL COURT ERRED IN FAILING TO MAKE ITS AWARD OF CHILD SUPPORT RETROACTIVE TO FEBRUARY 1, 2001, CREATING A WINDFALL TO THE PLAINTIFF.

I.
Both parties arguefor different reasonsthat the trial court erred in computing defendant's child support obligation. In Isaacson v. Isaacson, 348 N.J.Super. 560, 792 A.2d 525 (App.Div.), certif. denied, 174 N.J. 364, 807 A.2d 195 (2002), we recently addressed the issue of the calculation of a child support obligation where the parents' combined net income exceeds the maximum amount of the child support guidelines and the obligor parent does not dispute the ability to pay any reasonable amount of child support. Id. at 565, 792 A.2d at 528. Although Isaacson involved a post-judgment application for modification, the principles it established are applicable here.
In discussing the needs of children whose parents have income in excess of the income threshold of the child support guidelines Judge Carchman, writing for the court, stated, in pertinent part:
We have generally recognized that where the parties have the financial wherewithal to provide for their children, the children are entitled to the benefit of financial advantages available to them. We have characterized such circumstances as reflecting a parent's "good fortune" and have held that children are entitled to have their needs accord with the current standard of living of both parents, which may reflect *470 an increase in parental good fortune.... Children are entitled to not only bare necessities, but a supporting parent has the obligation to share with his children the benefit of financial achievement....
* * * *
Where our attention is focused on the unique circumstances of the high-income earner whose ability to pay increased child support is not in issue, the dominant guideline for consideration is the reasonable needs of the children, which must be addressed in the context of the standard of living of the parties. The needs of the children must be the centerpiece of any relevant analysis. Other economic-dependent factors are of less significance, as the high earner's concession of ability to pay has essentially limited the consideration of such economic-dependent issues. However, any consideration of needs must factor in the age and health of the children, as well as the other assets or income of the children, including any debts. Obviously, when considering the age factor, the needs of an infant child are distinctly different from the needs of teenage children[.]...
Determining a child's needs in these unusual financial circumstances presents unique problems. First, a balance must be struck between reasonable needs, which reflect lifestyle opportunities, while at the same time precluding an inappropriate windfall to the child or even in some cases infringing on the legitimate right of either parent to determine the appropriate lifestyle of a child.... This latter consideration involves a careful balancing of interests reflecting that a child's entitlement to share in a parent's good fortune does not deprive either parent of the right to participate in the development of an appropriate value system for a child. This is a critical tension that may develop between competing parents. Ultimately, the needs of a child in such circumstances also calls to the fore the best interests of a child.
We have suggested that "`needs' accord with the current standard of living of both parents, which may reflect an increase in parental good fortune." [Zazzo v. Zazzo, 245 N.J.Super. 124, 130, 584 A.2d 281, 284 (App.Div.1990), certif. denied, 126 N.J. 321, 598 A.2d 881 (1991).] We have also recognized that after basic needs are met and a parent's income permits, children are entitled to non-essential items that are reasonable and in the child's best interest....
* * * *
Judges must be vigilant in providing for "needs" consistent with lifestyle without overindulgence....
* * * *
Sharing good fortune does not absolve the parties or a judge of determining needs of a child in a sensible manner consistent with the best interests of the child....
* * * *
We also recognize, as we have done in the past, that the law is not offended if there is some incidental benefit to the custodial parent from increased child support payments....
This, too, requires the judge to balance the needs of the child. Incidental benefit is not offensive, but overreaching in the name of benefitting a child is....
[Id. at 579-80, 582-85, 792 A.2d at 537-540 (other citations omitted).]
See Pascale v. Pascale, 140 N.J. 583, 592, 660 A.2d 485, 489 (1995) (noting that children of divorce have the right "to be supported at least according to the standard of living to which they had grown accustomed prior to the separation of their parents[,]" *471 quoting Guglielmo v. Guglielmo, 253 N.J.Super. 531, 546, 602 A.2d 741, 749 (App.Div.1992), and citing Lepis v. Lepis, 83 N.J. 139, 150, 416 A.2d 45, 51 (1980)); Loro v. Colliano, 354 N.J.Super. 212, 223-24, 806 A.2d 799, 806 (App.Div.) (holding that children are entitled to share in their parents' good fortune, which may include bestowing benefits of nonessential items on the children to reflect such good fortune), certif. denied, 174 N.J. 544, 810 A.2d 64 (2002).
In addressing the applicable procedures to be followed in determining child support in high-income cases, Judge Carchman stated:
In such circumstances, the maximum amount provided for in the guidelines should be "supplemented" by an additional award determined through application of the statutory factors in N.J.S.A. 2A:34-23(a).... However, a judge should not extrapolate above the threshold using the respective percentages of total combined net income because extrapolation undermines the statistical basis of the guidelines....
[Isaacson, supra, at 581, 792 A.2d at 538 (other citations omitted).]
Thus, where the parents' combined net annual income exceeds the maximum threshold established in the child support guidelines set forth in Rule 5:6A, Appendix IX-F thereto, unless the court "finds that the guidelines are inappropriate in a specific case," and determines to "either disregard the guidelines or adjust the guidelines-based award to accommodate the needs of the children or the parents' circumstances[,]" Pressler, Current N.J. Court Rules, Appendix IX-A to Rule 5:6A, "Considerations in the Use of Child Support Guidelines," ¶ 3, "Deviating from the Child Support Guidelines" (2004), the trial court must "apply the guidelines up to [the threshold amount] and supplement the guidelines-based award with a discretionary amount based on the remaining family income ... and the factors specified in N.J.S.A. 2A:34-23[a]." Pressler, supra, at ¶ 20, "Extreme Parental Income Situations." See also Pascale, supra, 140 N.J. at 593-95, 660 A.2d at 489-91 (instructing that in extreme parental income circumstances, the child support guidelines are applied up to the maximum amount and the basic child support guidelines award is to be supplemented by an additional amount determined through analysis of the factors enumerated in N.J.S.A. 2A:34-23(a)); Hughes v. Hughes, 311 N.J.Super. 15, 29, 709 A.2d 261, 266 (App. Div.1998) (holding that, under circumstances where the combined income of the parents exceeded the maximum threshold of the child support guidelines, the trial court inadequately weighed the factors contained in N.J.S.A. 2A:34-23(a) in determining the child's needs, "in particular the obvious upper-middle-class standard that had been set by [the child's] parents").
Here, although the trial judge correctly referenced the applicable procedure, he failed to apply it. In the circumstances presented, the required steps to establish a child-support obligation are easily articulated. We recognize, however, that they are difficult to apply. Accordingly, we outline the required steps in some detail.
First, the reasonable needs of the children must be determined, guided by the principles we enunciated in Isaacson. Here, the trial court's determination of the needs of the children is not supported by substantial, credible evidence in the record. It is obvious, for example, that the record supports a finding that transportation costs are a reasonable component of the children's expenses; yet, none of plaintiff's transportation costs were attributed to the children. Additionally, in computing defendant's responsibility for a portion *472 of plaintiff's shelter expenses set forth on her case information statement entered in evidence, the judge multiplied defendant's respective percentage of the combined income-producing assets of the parties (65.18%) by the full amount of those shelter expenses that he determined represented expenditures by plaintiff made on behalf of the children (heat, electric, gas, water and sewer, telephone, and television). Obviously, since plaintiff also resides with the children, that cannot be so; some portion of those items must also represent plaintiff's needs.
The significant task in this case is to determine the reasonable lifestyle to which the children are entitled and, to the extent possible, differentiate between the needs or expenses of plaintiff and those that benefit the children and provide them with that reasonable lifestyle. Overlapping, common expenditures are inevitable and are, indeed, incident to one's status as a custodial parent. A reasonable allocation of such expenses based upon adequate, credible evidence in the record is the goal. Other expenses, such as lessons, summer camp, club dues, sports, and personal hygiene costs are more easily identifiable as attributable to the children.
Second, because there must be a fair and appropriate allocation of the children's needs between the parties, the ability of the parties to generate earned income, in addition to unearned income, must be determined. Where one or both parties have the ability to earn income, but have chosen not to work, it is insufficient and unfair to simply utilize the unearned income received by the parties from their assets to determine the share of the children's needs that each party should bear. Although relevant, "[c]hild support will be based on income rather than on net worth." Loro, supra, 354 N.J.Super. at 223, 806 A.2d at 806. It is fundamental that "[t]he fairness of a child support award resulting from the application of [the child support] guidelines is dependent on the accurate determination of a parent's net income." Pressler, supra, at ¶ 12, "Imputing Income to Parents."
Therefore, "[I]f the court finds that either parent is, without just cause, voluntarily underemployed or unemployed, it shall impute income to that parent according to[,]" inter alia, the "potential employment and earning capacity using the parent's work history, occupational qualifications, educational background, and prevailing job opportunities in the region." Ibid. Additionally:
In determining whether income should be imputed to a parent and the amount of such income, the court should consider: (1) what the employment status and earning capacity of that parent would have been if the family had remained intact or would have formed, (2) the reason and intent for the voluntary underemployment or unemployment, (3) the availability of other assets that may be used to pay support, and (4) the ages of any children in the parent's household and child-care alternatives. The determination of imputed income shall not be based on the gender or custodial position of the parent. Income of other household members, current spouses, and the children shall not be used to impute income to either parent except when determining the other-dependent credit. When imputing income to a parent who is caring for young children, the parent's income share of child-care costs necessary to allow that person to work outside the home shall be deducted from the imputed income....
[Ibid.]
Here, the trial court incorrectly applied a mechanistic approach to the child-support calculus, in circumstances where a *473 fact-sensitive analysis was required, by ascertaining the income-producing assets of each party, determining each party's percentage relationship to their combined unearned-income-producing assets, and then utilized that percentage relationship to determine each party's child support responsibility. Here, the issue of imputation of income cannot be avoided by the reality that either party could meet the reasonable needs of the children from the unearned income produced by their assets. We reach that conclusion because of the necessity that the court allocate the reasonable needs of the children between the parents. It would be inequitable to allocate those needs simply based upon an analysis of unearned income, since one or both parents would thereby have the ability to decrease their respective responsibility for the children's needs by simply not working and avoiding imputation-of-income principles.
Moreover, we perceive no basis here to depart from well-established law requiring imputation of income where a parent is voluntarily unemployed. See Tash v. Tash, 353 N.J.Super. 94, 99, 801 A.2d 436, 438-39 (App.Div.2002) (noting that both the guidelines and case law of this State permit imputation of income when determining child support obligations); Halliwell v. Halliwell, 326 N.J.Super. 442, 448, 741 A.2d 638, 641 (App.Div.1999) (stating that "[t]he potential earning capacity of an individual, not his or her actual income, should be considered when determining the amount a supporting party must pay"); Dorfman v. Dorfman, 315 N.J.Super. 511, 516-17, 719 A.2d 178, 180-81 (App.Div.1998) (noting that although imputation of income rules apply when determining child support, involuntary termination of employment must be considered when deciding whether a parent's income level equates to that parent's ability to earn); Bencivenga v. Bencivenga, 254 N.J.Super. 328, 331, 603 A.2d 531, 531 (App.Div.1992) (stating the fact that a court will not order a parent to work does not mean that it cannot impute income to that parent); Weitzman v. Weitzman, 228 N.J.Super. 346, 354, 549 A.2d 888, 891-92 (App.Div.1988) (recognizing the right of courts to realistically appraise a parent's earning capacity in determining child support), certif. denied, 114 N.J. 505, 555 A.2d 623 (1989); Lynn v. Lynn, 165 N.J.Super. 328, 340-41, 398 A.2d 141, 146-47 (App. Div.) (noting, by citing to Mowery v. Mowery, 38 N.J.Super. 92, 102, 118 A.2d 49, 54-55 (App.Div.1955), certif. denied, 20 N.J. 307, 119 A.2d 791 (1956), that in setting child support, the court has the right to appraise the supporting parent's earning capacity), certif. denied, 81 N.J. 52, 404 A.2d 1152 (1979). See also, Elizabeth Trainor, Annotation, Basis for Imputing Income for Purpose of Determining Child Support Where Obligor Spouse is Voluntarily Unemployed or Underemployed, 76 A.L.R. 5th 191 (2000).
Accordingly, on remand the court must determine the ability of each parent to earn income and factor that ability into the income equation. However, in considering the ability of plaintiff to work, the court must consider her enhanced-care responsibilities for Daniel, the parties' special-needs child.
Third, upon determining the respective percentage of each party's net imputed earned and unearned income of their total combined net imputed earned and unearned income, those percentages shall be applied to determine each party's share of the maximum basic child support guideline award for two children. Currently, that maximum basic child support guideline award for two children is $654 per week. Pressler, supra, Appendix IX-F to Rule 5:6A, "Schedule of Child Support *474 Awards." Here, defendant's percentage of the parties' combined total net income would be applied to yield his share of the guidelines-based award.
Fourth, the maximum basic child support amount, here, $654 per week, or, $2,834 per month, should be subtracted from the court-determined reasonable needs of the children to determine the remaining children's needs to be allocated between the parties. Then, the court must analyze the factors outlined in N.J.S.A. 2A:34-23(a) and determine each party's responsibility for satisfying those remaining needs. It is the result of that analysis that is to be utilized when determining the fair and equitable allocation of the remaining needs of the children between the parties. In performing that analysis the court must be mindful that unlike the child support guidelines analysiswhere the net earned and unearned income of each parent and the respective percentage of each parent's net income to their combined net income is the only factor to be considered in determining a guidelines-based analysisthe net income of each party is only one factor to be considered when performing the statutory analysis. See N.J.S.A. 2A:34-23(a)(3). Additionally, we note that the sole use of a percentage-of-income formula to determine child support ignores the other factors set forth in N.J.S.A. 2A:34-23(a) that require analysis.
Finally, the guiding principles in determining the child support obligation of the non-custodial parent (or parent of alternate residence in a shared-parenting arrangement) are that child support is a continuous duty of both parents; that children are entitled to share in the good fortune and current income of both parents and enjoy a lifestyle comparable to that of their parents; and that children should not be the economic victims of divorce or separation.
Here, we are constrained to reverse the child support award and remand for application of the principles discussed herein to the facts of this case to determine the fair and equitable child support obligation of defendant.

II.
Plaintiff argues that the trial court erred in denying her application for counsel fees. In their agreement, the parties were to bear their own counsel fees; however, plaintiff reserved the right to seek counsel fees incurred during trial of the unresolved issues.
In rendering his oral decision on January 16, 2002, the trial judge correctly articulated the applicable criteria for considering a claim for counsel fees, citing to Williams v. Williams, 59 N.J. 229, 281 A.2d 273 (1971) and Rule 5:3-5(c). However, other than concluding that "[a] qualitative review of the applicable court rules and case law leads this court to conclude that the criteria ... have not been met in this case[,]" the judge made no findings on those criteria and provided no explanation for his conclusion. See Rule 1:7-4(a) (requiring the trial court to make findings of fact and conclusions of law on each issue). Additionally, since we have remanded the matter for findings concerning the parties' ability to produce earned income, a relevant factor in the counsel-fee calculus, we reverse the denial of counsel fees and remand that issue for further consideration and an analysis of the factors set forth in Williams and Rule 5:3-5(c).

III.
Plaintiff further argues that defendant's assets should not have been reduced by the value of his 401(k) plan or by the future taxes he may pay on that plan, and that trial court erred in declining to name *475 plaintiff as custodian of Daniel's special-needs trust. Defendant argues in his cross-appeal that the trial court erred in failing to make its award of child support retroactive to February 1, 2001.
After analyzing the record in light of the written and oral arguments advanced by the parties, we conclude those issues are without sufficient merit to warrant discussion in a written opinion. Rule 2:11-3(e)(1)(E).
Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.